IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

GENA LEANNE WHILLOCK                                                    PLAINTIFF

          v.                              CIVIL NO. 3:18-CV-3089

UNITED OF OMAHA LIFE INSURANCE
And JOHN AND JANE DOE 1-100                                            DEFENDANTS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*  Plaintiff challenges the termination of her benefits under her former employer Community Publishers, Inc.'s (CPI) Long-Term Disability Plan (hereinafter "the Plan").  Plaintiff originally named as Defendants United of Omaha Life Insurance Company (United), as the Insurer and Plan Administrator; CPI, as the Policy Holder; and John and Jane Does 1-100.  However, CPI was dismissed pursuant to the parties' joint motion. (Docs. 15, 16).  The parties have submitted the administrative record (Doc. 17 - cited as AR) and briefs (Docs. 20, 21) on the issues before the Court.  The matter is now ripe for consideration. For the reasons stated below, the undersigned recommends AFFIRMING the termination of Plaintiff's benefits.

### DEFINITION OF DISABILITY UNDER THE PLAN

The Plan defines disability as:

(b)      after the Elimination Period, You are:

    1.  prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

2.  unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, *Disability* and *Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation. . . .

**Material Duties** means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. . . .

**Regular Occupation** means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with another service or other information that We determine to be of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

(AR 123-125).

## SUMMARY OF PLAINTIFF'S CLAIM FOR LTD BENEFITS

## AND TERMINATION OF BENEFITS

Plaintiff was employed by CPI as an Account Executive beginning on August 19, 2002. (AR 82). Her last day of work was on August 15, 2014. (AR 82). On September 3, 2014, Plaintiff initiated a claim for short-term disability benefits due to a diagnosis of transverse myelitis with symptoms of neck pain, headache, and left arm paresthesias/pain. (AR 79-84). As a part of Plaintiff's short-term disability claim, an "HR/Business Manager" for CPI completed an Employer's Statement, wherein she described Plaintiff's work as an Account Executive as "light" meaning:

20 lbs. maximum lifting with frequent lift/carry up to ten pounds. A job is light if less lifting is involved but significant walking/standing is done or if done mostly sitting but requires push/pull on arm or leg controls.

(AR 82).  Plaintiff's major job duties were listed as "contacting customers for advertising, driving to customers' places of business, walking, sitting, computer work, phone calls."  (Id.).

On September 10, 2014, Plaintiff was awarded short-term disability benefits. (AR 75-76). United notified Plaintiff on January 12, 2015, that she had been approved for long-term disability (LTD) benefits, dating back to November 22, 2014.   (AR 1264-1267).  On July 11, 2016, United notified Plaintiff that it was terminating her LTD benefits, as it had determined that Plaintiff no longer met the initial twenty-four month definition of "Disabled" under the Plan, in that "the medical documentation fails to substantiate a condition or conditions that continue to render you Disabled from performing the Material Duties of your Regular Occupation."  (AR 964).

## PLAINTIFF'S MEDICAL TREATMENT AND DIAGNOSTIC RECORDS

### Dr. Richard Jung

Plaintiff's primary treating physician was Dr. Richard Jung, a neurologist.  Plaintiff saw Dr. Jung initially on June 30, 2014, at which time he diagnosed her with transverse myelitis.[1]  (AR 1321-1325).  Dr. Jung authored an Attending Physician's Statement (APS) in February of 2016,

---

[1]Transverse myelitis is an inflammation of both sides of one section of the spinal cord.  This neurological disorder often damages the insulating material covering nerve cell fibers (myelin). Transverse myelitis interrupts the messages that the spinal cord nerves send throughout the body. This can cause pain, muscle weakness, paralysis, sensory problems, or bladder and bowel dysfunction.  There are many different causes of transverse myelitis including infections and immune system disorders that attack the body's tissues.  Treatment for transverse myelitis includes medications and rehabilitative therapy.  Most people with transverse myelitis recover at least partially.  See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/transverse-myelitis/symptoms-causes (last visited Feb. 25, 2020).

wherein he noted a diagnosis of neurosarcoidosis,[2] with objective findings of cervical myelitis and biopsy proven sarcoidosis. (AR 1051). Dr. Jung reported, "Aggressive neuro sarcoid lesion in cervical spine contributes to considerable pain that is debilitating." (Id.). Dr. Jung noted that Plaintiff was undergoing monthly Remicade infusion treatments and he characterized Plaintiff's prognosis as "fair." (Id.). Dr. Jung opined that in an eight-hour workday, Plaintiff could sit for eight hours, stand for two hours, and walk for one hour. She had restrictions in lifting/carrying of fifteen pounds. Dr. Jung reported no restrictions in repetitive hand movements. (Id.).

**Plaintiff's Imaging Results**

The medical records showed numerous MRIs and other imaging ordered by Dr. Jung and other treating physicians. The earliest cervical spine MRI of record was on May 28, 2014, showing an abnormality within the upper to mid cervical spinal cord that exhibited altered signal intensity and enhancement following contrast administration, with the exact etiology uncertain. (AR 592). Plaintiff underwent additional imaging of her cervical spine on June 17, 2014 (showing abnormalities), on July 11, 2014 (showing a differential diagnosis including transverse myelitis), on September 26, 2014 (showing continued abnormalities), and on October 29, 2014 (revealing a stable cervical cord lesion since 9/26/14, with progression since 5/28/14, the appearance, of which,

---

[2]Neurosarcoidosis is a manifestation of sarcoidosis in the nervous system. Sarcoidosis is a chronic inflammatory disorder that typically occurs in adults between 20 and 40 years of age and primarily affect the lungs, but can also impact almost every other organ and system in the body. Neurosarcoidosis is characterized by inflammation and abnormal cell deposits in any part of the nervous system - the brain, spinal cord, or peripheral nerves. It can appear in an acute, explosive fashion or start as a slow chronic illness. The prognosis for patients with neurosarcoidosis varies. Approximately two-thirds of those with the condition will recover completely; the remainder will have a chronically progressing or on-and-off course of illness. See https://www.ninds.nih.gov/Disorders/All-Disorders/Neurosarcoidosis-Information-Page (last visited Feb. 25, 2020).

suggested either an infectious/inflammatory process such as neurosarcoidosis or demyelinating disease),  (AR 345, 346, 348-349, 918).

On January 14, 2015, a MRI of Plaintiff's cervical spine showed improvement in the cervical lesion.  That MRI report specifically stated that:

> The high signal, enhancing lesion involving the cervical spinal cord has decreased markedly in size since 9/26/2014.  The lesion was apparently secondary to sarcoidosis, according to history.  Resolution of mass effect.  Mild residual increased signal intensity and enhancement involving the spinal cord at C3-4, dorsally and on the right.
>
> No evidence of spinal canal stenosis or disc herniation in the cervical region.

(AR 350).

A follow-up MRI on May 12, 2015, continued to show improvement:

> Stippled, linear areas of enhancement predominantly along the right dorsal aspect of the spinal cord spanning the levels of C2-C3 to C4-C5, which has increased since January 14, 2015, but markedly decreased since September 26, 2014.  Enhancement pattern appears intramedullary and probably leptomeningeal.  Findings could reflect neurosarcoidosis given patient's history.  Suggest follow-up examination to resolution.  No bone marrow edema pattern.  No spinal canal or neural foraminal stenosis.  Low T1 marrow signal, which is nonspecific. Correlate clinically for anemia or marrow replacement/proliferation.

(AR 351).

Lastly, an October 30, 2015 MRI of Plaintiff's cervical spine showed:

> Continued improvement in both T2 signal and the enhancement involving the cervical cord.  Today there is essentially complete resolution of the enhancement in the right dorsolateral cord with almost complete resolution of the T2 signal although some of this remains and there is now some concavity of the cord suggestive of mild atrophy.  More than likely the residual T2 signal suggest areas of gliosis.  When compared to the outside exam from 10/29/2014, the increased T2 signal within the central gray matter is no longer present.  These findings all suggest improvement in patient's imaging.

(AR 353).

## Mayo Clinic Treatment

Plaintiff was evaluated at the Mayo Clinic from October 29, 2014 through November 5, 2014 (AR 915-929), including an evaluation by a neurologist, Dr. Jan-Mendelt Tillema.  Dr. Tillema recommended a six-month course of high-dose steroids to treat the sarcoid  lesion, stating he was hopeful that this would reduce her pain.  Dr. Tillema stated that "it would be helpful to gradually get her off the narcotic pain medications" and increase Lyrica.   (AR 923).

## Dr. Joseph Mayus

Dr. Mayus, a rheumatologist, also treated Plaintiff for additional issues such as fibromyalgia and osteoarthritis and upon referral from Dr. Jung for her history of sarcoidosis.  Dr. Mayus recommended treating Plaintiff with Remicade infusions and repeating an MRI scan in three to four months.  (AR 998).  Dr. Mayus saw Plaintiff on February 12, 2016, and noted her continued chronic pain, although not worse than before.  (AR 367).  Dr. Mayus referenced her follow-up MRI showing significant improvement and near complete resolution of the enhancement at the right dorsolateral cord and an unremarkable MRI of the thoracic spine. (AR 367).  Plaintiff's examination showed that she had osteoarthritic change at the tarsal/metatarsal articulation and prominent tender points; that she was able to stand and walk unassisted with a stable-looking gait; that she was able to walk on heel and toe; and that she had 5/5 strength of the deltoids, biceps, triceps.   (AR 368).   Her sarcoidosis with neurosarcoidosis were noted to be clinically and radiographically stable.   (AR 369).

**Dr. William Ackerman and Dr. Christopher Mocek**

Dr. William Ackerman and Dr. Christopher Mocek, pain management specialists, treated Plaintiff for her chronic pain.   Upon physical examination of Plaintiff in February of 2016, Dr. Ackerman noted that Plaintiff had pain in her upper cervical, thoracic, and lumbar spines and had worsening pain with flexion.  (AR 1023-1024).  Dr. Ackerman opined that Plaintiff had pathology that warranted continued pharmacologic management.  (AR 1023-1024).

Plaintiff also saw Dr. Mocek between April and July of 2016 for pain management of her chronic neck, thoracic and lumbar area pain, arm numbness, and pain from fibromyalgia.  Dr. Mocek discussed options for pain control with Plaintiff, including a pain pump; however, further evaluation revealed that Plaintiff was not a candidate for a pain pump due to the location of her pain; her medications were adjusted instead.  (AR 856, 859, 862-863, 865).  On July 5, 2016, Plaintiff reported that the medication prescribed by Dr. Mocek was working; however, when she returned on July 26, 2016, Plaintiff described her neck pain as moderate to severe.  (AR 702, 868).

**UNITED'S TERMINATION OF BENEFITS DECISION**

Nurse Jessica Hedges performed a review of Plaintiff's medical records on June 10, 2016. Nurse Hedges observed:

> Claimant seen by rheumatology who indicated neurosarcoidosis and fibromyalgia. Claimant on Remicade infusions every 8 weeks and tolerating fairly.  MD references repeat imaging of the cervical spine from October 2015 that notes near resolution of previous enhancing lesions and resolution of increased signal gray matter.  Exams indicate tender points and some decreased shoulder motion but no gait or station deficits.  No strength deficits noted throughout.

(AR 974).  Nurse Hedges concluded:

> Based on current medical documentation, claimant should be able to lift, push, pull and carry up to 20 lbs occasionally and less than this more frequently.  Claimant

should be able to sit up to 8 hours and stand and/or walk up to a total of 8 hours in an 8 hour workday with ability to strength [sic] and/or change positions as needed for comfort or at least once every 30 minutes to one hour.  Claimant should avoid reaching or work at or above shoulder level.  Claimant should avoid constant/repetitive head turns.  No evidence that claimant is unable to drive personal vehicle but should avoid driving while under the influence of opioid narcotics.  Claimant might benefit from an ergonomic work station.  Claimant should avoid climbing ladders.  Claimant might also benefit from light exercise program and evaluation/treatment for any mental health concerns/issues.

. . .

Claimant does have other medical conditions of hypertension, anxiety/panic and depression, chronic pain and fibromyalgia.  These conditions may contribute to overall functional status but do not appear to be causing any significant ongoing impairment.

(AR 974-975).

Nurse Hedges summarized her review of Plaintiff's medical records and her conclusions in a letter to Dr. Jung dated June 3, 2016.  She asked Dr. Jung to either acknowledge his agreement with her assessment, or if he did not agree, to respond with symptoms, physical exam findings, and diagnostic tests to support any restrictions and limitations.  (AR 979).  Dr. Jung did not respond.

In a letter dated July 11, 2016, United notified Plaintiff that it was terminating her benefits effective that date.  (AR 289-95).

## ADMINISTRATIVE APPEAL

### Plaintiff's Submissions

Plaintiff filed an administrative appeal and included a September 29, 2016 report from Dr. Kevin Collins, a Board Certified Physical Medicine and Rehabilitation Physician, to whom Dr. Mocek referred the Plaintiff.  Dr. Collins noted that he did not have Plaintiff's actual MRI reports, but opined:

She has been treated with aggressive steroids and now Remicade. She is ongoing with pain and she has large doses of pain medications, so would preclude her from driving around the state for her job just on its own.

Patient is fully disabled in my medical opinion . . . with her history of neurosarcoidosis, which is a progressively worsening systemic chronic granulomatous disease and tends to affect almost any organ system. She will continue to require aggressive management as it relates to such. I see no way she could work her job and/or any other given the above-mentioned circumstances.

(AR 276-78).

Plaintiff also submitted an APS dated August 22, 2016, from Dr. Mayus, and an APS dated October 21, 2016, from her primary care physician, Dr. Ronald Reese. (AR 281-84). Both doctors indicated that Plaintiff could sit for four hours out of an eight-hour workday, stand for one hour, walk for one hour, and had restrictions climbing, lifting, gripping, squatting, kneeling, bending, driving/operating motorized equipment, etc. Both doctors stated that they did not expect Plaintiff's condition to improve, with Dr. Mayus noting that "there is potential for neurologic deterioration if sarcoidosis flares." (AR 281-84).

### United's Independent Reviews

United obtained an independent medical review from Dr. Jacob Yacov Kogan, a board certified neurologist. Dr. Kogan reviewed Plaintiff's medical records and, in a report dated January 11, 2017, found that the diagnoses supported by the records included "sarcoidosis confirmed by lymph node biopsy and cervical myelitis confirmed by contrast enhancing lesions on MRI. The above evidence combines to support the diagnosis of neurosarcoidosis." (AR 248). Dr. Kogan opined that Plaintiff had no restrictions or limitations from a neurological perspective as of July 11, 2016, to the date of his report. Dr. Kogan stated the following rationale:

[T]he claimant had resolution of active disease/inflammation at the cervical spinal cord on MRI from April 2016[,] given resolution of enhancement, no increase in the size of the lesions, no new lesion, and impression of gliosis on the radiological

9

report. There were no corresponding neurological deficits that would limit function or that would be referred to a cervical myelopathy. Specially, Dr. Jung and Dr. Mayus document no long tract signs. On 4/1/16[,] Dr. Jung documents normal strength, normal tone without spasticity, normal reflexes without hyperflexia and normal gait. There is only a patchy type sensory loss to pin prick of the R upper extremity without a sensory level. On 8/8/16[,] Dr. Mayus documents "stable looking walk, able to climb on and off the table," 5/5 strength in the upper extremities, no ataxia, and no hyperreflexia. Thus, from a neurological perspective, the claimant had resolution of active disease/inflammation at the cervical spinal cord by imaging and no clinical signs of myelopathy that would limit function. Her cervical spine pain is multifactorial and may have been in part initially related to active myelitis. However, given significant improvement of the myelitis, cervical spine pain preceding her diagnosis by 3 years in 2011, and multiple "exquisite tender points" documented by Dr. Mayus in 8/8/16, the etiology of the neck pain is likely musculoskeletal in nature related to her fibromyalgia (a similar opinion is expressed by Dr. Mayus in 8/13/2015 . . . ) with potential exacerbation from opioid induced hyperalgesia given long term opiate use and psychological factors given her history of depression and anxiety. Discussion of dysfunction, restriction and limitation related to fibromyalgia, opioid induced hyperalgesia and depression/anxiety is referred to the appropriate experts.

(AR 249).

United also obtained an independent medical review from Dr. Julia Y. Ash, a board certified rheumatologist. (AR 221-29). Dr. Ash reviewed Plaintiff's medical records and, in a report dated February 8, 2017, she gave the following medical analysis:

Medical record documents self-reported complaints of neck pain and joint pain of such severity as to interfere with sleep, moderate-to-severe degree and occasionally unbearable, in most positions. Medical record, however, provides no clinical or radiographic support for such severity of pain. Rheumatologic evaluation documents no specific neck abnormality with the exception of muscular tenderness. Dr. Collins's exam documents full neck range of motion. Multiple cervical CT and MRIs obtained for evaluation of neurosarcoidosis document no vertebral or soft tissue abnormalities, no disc herniation, no clinically significant degenerative disc disease and no spinal or foraminal narrowing or stenosis. Severe neck pain is self-reported only without clinical or radiographic support. Pain etiology is not established and severe pain is not supported by available medical documentation. Cervical myelitis secondary to neurosarcoidosis, even when active, does not typically result in neck pain of such degree as reported in the medical record. At the time of complaints, the inflammatory cervical lesion has mostly resolved with Infliximab therapy as demonstrated on 4/28/2016 cervical spine MRI report. This MRI report also documents absence of musculoskeletal etiology to support neck pain. It documents absence of spondylolisthesis, maintained vertebral body height

and disc space, absence of focal destructive lesion, absence of soft tissue or paraspinal thickening of collection.  No spinal canal or neural foraminal stenosis is documented.  4/28/2016 thoracic spine MRI is also documented as normal.  Due to complaints of neck and diffuse pain without alternative etiology, Dr. Mayus mentions diagnosis of fibromyalgia as a diagnosis of exclusion.  Treatment with Cymbalta . . . is documented in the record.  Fibromyalgia on treatment supports restrictions and limitations.  Fibromyalgia, as documented in the medical record, does not support loss of function.  Physical examination is consistently documented as normal . . . .

(AR 225-26).

Dr. Ash concluded that the restrictions and limitations outlined by Plaintiff's treating physicians were mainly based on self-reported complaints and were not supported by documented physical examinations, musculoskeletal examinations, or radiographic data.  Dr. Ash believed that the chronic use of opioids should be discontinued by the Plaintiff, as such use was based on Plaintiff's subjective complaints and was not supported by any objective etiology. Dr. Ash observed that Plaintiff's neurosarcoidosis was in remission on treatment and her fibromyalgia was being treated with FDA-approved therapy.  Dr. Ash opined that Plaintiff could sit up to eight hours per day with five-minute breaks every two hours to accommodate stretching for her fibromyalgia-associated stiffness; stand for up to four hours per day, one hour at a time; walk three hours per day, one hour at a time; occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; frequently reach, handle, finger, etc. without restriction; frequently drive; occasionally climb stairs; and never crawl or kneel.  (AR 227).

**United's Appeal Decision**

United upheld its previous decision by letter dated February 27, 2017.  (AR 230-36).  United discussed the findings of the independent medical reviews of Dr. Kogan and Dr. Ash, as well as the lack of any objective findings from Plaintiff's treating physicians, Dr. Jung and Dr. Mayus.  United concluded:

The clinical records do not support any functional and/or cognitive impairment that would preclude you from performing the material duties of your regular occupation or any gainful occupation.  Fibromyalgia is a manageable condition . . .

Despite your complaints of pain, the physical examinations have noted preserved function with resolution of active sarcoidosis/inflammation and without neurological deficit or compromise in muscle strength.

While you have some deficits that would preclude you from performing work in a medium or heavy capacity, the records support you would be able to perform work as an Account Executive as well as other sedentary-to-light physical demand occupations.

(AR 234).

## DISCUSSION

### A.  Standard of Review

ERISA affords a plan beneficiary the right to judicial review of a benefits determination. *See* 29 U.S.C. § 1132(a)(1)(B).  The Court reviews an administrator's decision *de novo* unless the plan grants the administrator discretionary authority.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  United concedes that the appropriate standard of review is de novo in the present case, as the Plan does not contain a discretionary review clause.

### B.      The Termination of Plaintiff's Benefits

In the absence of a significant change in the medical information available, an ERISA administrator's previous payment of benefits is a circumstance that weighs against the propriety of an insurer's decision to discontinue the benefits.  See McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2001).  The undersigned agrees with United that the information available to it changed significantly between the time it granted Plaintiff long-term disability benefits on November 22, 2014, to when it discontinued those benefits on July 11, 2016.  United's

initial grant of benefits was based on the diagnosis of neurosarcoidosis manifested by transverse myelitis, with a neurosarcoid lesion in Plaintiff's cervical spine that caused her considerable pain. After treatment with steroids and Remicade, however, the medical records document essentially complete resolution of the lesion.

Dr. Kogan, a board certified neurologist who conducted an independent medical review of Plaintiff's medical records, found that Plaintiff had no restrictions or limitations from a neurological perspective as of July 11, 2016.  Dr. Kogan explained that Plaintiff's treating physicians, Dr. Jung and Dr. Mayus, documented no long tract signs, normal tone without spasticity, normal reflexes without hyperflexia, normal gait, able to climb on and off the table, 5/5 strength in the upper extremities, no ataxia, and no hyperreflexia.  Dr. Kogan concluded, "Thus, from a neurological perspective, the claimant had resolution of active disease/inflammation at the cervical spinal cord by imaging and no clinical sings of myelopathy that would limit function." (AR 249).

Dr. Ash, a board certified rheumatologist who conducted an independent medical review of Plaintiff's medical records, observed that Plaintiff's neurosarcoidosis was in remission and her fibromyalgia was being treated with Cymbalta.  Dr. Ash noted that Plaintiff had no specific neck abnormality with the exception of muscular tenderness; multiple cervical CT and MRIs documented no vertebral or soft tissue abnormalities, no disc narrowing or stenosis, no spondylolisthesis, maintained vertebral body height and disc space, no focal destructive lesion, and no soft tissue or paraspinal thickening.  Dr. Ash observed that Plaintiff's physical examinations were consistently documented as normal.  Dr. Ash concluded that the restrictions outlined by Plaintiff's treating physicians were mainly based on self-reported complaints of pain and were not

supported by documented physical examinations, musculoskeletal examinations, or radiographic data.  Dr. Ash also believed Plaintiff should discontinue the chronic use of opioids.

Without objective medical data, United appropriately relied on the independent reviews of Dr. Kogan and Dr. Ash to determine that Plaintiff's benefits should be discontinued.  United had no obligation to defer to the opinions of Plaintiff's treating physicians, which were primarily based on Plaintiff's subjective complaints of pain.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003); Cooper v. Metropolitan Life Ins. Co., 862 F.3d 654, 662 (8th Cir. 2017).  It is also noteworthy that Dr. Jung did not respond when asked to either acknowledge his agreement with United's assessment of Plaintiff's work abilities or to explain symptoms, physical exam findings, and diagnostic tests that supported further restrictions and limitations.  Cf. Pralutsky v. Metro Life Ins. Co., 435 F.3d 833, 841 (8th Cir.) (finding no abuse of discretion when there was no objective proof of disabling fibromyalgia in a treating physician's letter that merely repeated the participant's subjective complaints of pain and fatigue and specifically noting the plan's repeated requests for objective evidence), cert. denied, 549 U.S. 887 (2006).

Plaintiff argues that United failed to apply the correct definition of disability.  Plaintiff states that the Plan defines disability as being unable to perform at least one of the material duties of "your **Regular Job**" and United, in its initial denial and final denial, used the term "**Regular Occupation**."  (Doc. 20 at pgs. 17-18).  Plaintiff is incorrect.  The Plan definition uses the term "Regular Occupation" (AR 123), as correctly set out in United's decisions.

Plaintiff next argues that United never outlined what the material duties of Plaintiff's regular job were and instead only relied on the physical requirements of a light demand occupation. The undersigned sees no merit to Plaintiff's argument.  In an Employer's Statement, Plaintiff's position as an Account Executive was described as light work, which was defined as "20 lbs.

14

maximum lifting with frequent lift/carry up to ten pounds.  A job is light if less lifting is involved but significant walking/standing is done or if done mostly sitting but requires push/pull on arm or leg controls."  (AR 82).  Further, Plaintiff's major job duties were listed as "contacting customers for advertising, driving to customers' places of business, walking, sitting, computer work, phone calls."  (Id.).

Plaintiff further argues that United failed to consider whether narcotic use prevented her from driving to see customers, whether Plaintiff's pain and grip loss impaired her ability to write and type for extended periods of time, and whether her vision changes restricted her ability to use a computer.  Plaintiff points to no objective medical evidence to support her claim that vision changes and grip loss restrict her ability to type, write or use a computer.  Plaintiff likewise points to no objective medical evidence that supports the chronic use of narcotics.  As noted above, Dr. Ash, the reviewing neurologist, believed the chronic use of opioids should be discontinued because such use was not supported by any objective etiology.  Dr. Tillema, the neurologist who evaluated Plaintiff at the Mayo Clinic, also believed that Plaintiff should gradually get off narcotic pain medications.  Thus, narcotic use cannot objectively and legitimately be said to have rendered Plaintiff unable to perform her work duties.

Plaintiff next cites to 29 C.F.R. § 2560.503-1(h)(3)(iii) and argues that United "failed to consult with medical professionals appropriate to provide a medical judgment in the first denial." (Doc. 20 at pg. 22).  The regulation to which Plaintiff cites provides that "in deciding an **appeal** of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii) (emphasis added).  Regardless of the basis for the initial termination of

Plaintiff's benefits, United complied with the above regulation in deciding Plaintiff's **appeal**, as United consulted with and had independent medical reviews conducted by both a neurologist and a rheumatologist.  The undersigned, therefore, sees no merit to Plaintiff's argument.

Finally, Plaintiff argues that the Court should consider the fact that the Social Security Administration ("SSA") determined that Plaintiff was disabled as of August 31, 2014.  (AR 172-80).  It is well-settled in the Eighth Circuit that an ERISA plan administrator is not bound by SSA disability determinations.  See Prezioso v. Prudential Ins. Co. of Am., 748 F.3d 797, 806 (8th Cir. 2014); Farfalla v. Mutual of Omaha Ins. Co., 324 F.3d 971, 975 (8th Cir.), cert. denied, 540 U.S. 875 (2003).  The SSA determination was based on deference it accorded to Plaintiff's treating physicians, whose findings were, as noted above, primarily based on Plaintiff's subjective complaints and not objective medical evidence.  Further, the SSA did not have before it the two independent medical reviews conducted by United.

## **CONCLUSION**

Based on the foregoing, the undersigned finds that United's termination of Plaintiff's long-term disability benefits was supported by the evidence and the decision was made after careful and thorough review, while comporting with ERISA and the clear language of the Plan.  The undersigned, therefore, recommends **AFFIRMING** the decision to terminate benefits and **DISMISSING** this case **WITH PREJUDICE**.

**The parties have fourteen days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

16

Dated this 21st day of April 2020.

_/s/    Erin L. Wiedemann_
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE